## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| JAMES BRETHOUR,<br><br>      Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., and TRANS UNION LLC,<br><br>      Defendants. | Case No.:<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff James Brethour, by and through the undersigned counsel, brings this action on an individual basis, against Defendants Experian Information Solutions, Inc. ("Experian") and Trans Union LLC ("Trans Union") and states as follows:

## PARTIES

1.      James Brethour ("Plaintiff") is a natural person residing in Los Alamos, New Mexico, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

2.      Experian is a consumer reporting agency that maintains its principal place of business at 475 Anton Boulevard, Costa Mesa, California 92626. Experian is authorized to do business in this District.

3.      Trans Union is a consumer reporting agency that maintains its principal place of business at 555 West Adams Street, Chicago, Illinois 60661. Trans Union is authorized to do business in this District.

1

## JURISDICTION AND VENUE

4.     Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

5.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendant's Creditor-Customers*

6.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

7.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this

remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d

Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

8.      Over a decade ago, the Third Circuit apprised Defendant Trans Union of the high

duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not
> nearly as subtle as may at first appear, it is in fact quite dramatic….
>
>
> There are, of course, inherent dangers in including any information in a credit report
> that a credit reporting agency cannot confirm is related to a particular consumer.
> Such information is nearly always "used or expected to be used or collected in
> whole or in part for the purpose of serving as a factor in establishing the consumer's
> eligibility for … credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to
> include misleading information as cavalierly as Trans Union did here negates the
> protections Congress was trying to afford consumers and lending institutions
> involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the
> FCRA that would destroy its remedial scheme by allowing a credit reporting agency
> to escape responsibility for its carelessness whenever misleading information finds
> its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA
> and it cannot escape that responsibility as easily as it suggests here. Congress
> clearly intended to ensure that credit reporting agencies exercise care when
> deciding to associate information with a given consumer, and the record clearly
> supports the jury's determination that Trans Union did not exercise sufficient care
> here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

9.      Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a
consumer report it shall follow reasonable procedures to assure maximum possible
accuracy of the information concerning the individual about whom the report
relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

10.    Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

11.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

12.    It has long been the law that a CRA, such as Experian or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC,* 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-

TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

13.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

14.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

15.     Further, as Experian and Trans Union are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that CRAs have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133

(1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

16.    It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

17.    Unknown to Plaintiff until this lawsuit, it has long been the practice of Experian and Trans Union to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to third-party outsourced vendors located overseas. Experian and Trans Union use vendors including Intelenet, Sitel, and Teleperformance.

18.    These companies use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

19.    These agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; look at data to see if the furnisher is problematic, under investigation, or unreliable; or take longer than 5 minutes per dispute.

20.    The dispute processing agents' sole responsibility is (not to *investigate* but rather) to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

21.    None of the options properly codifies the central thrust of Plaintiff's disputes, namely, that the furnisher at issue, Momnt Technologies, and its associated lender, Cross River Bank, were under investigation or publicly recognized for issuing and maintaining illegal, fraudulent, and/or otherwise unenforceable debts.

22.    Experian and Trans Union itself did not conduct any reinvestigations of Plaintiff's disputes. Upon dispute, they did not conduct a reasoned review of the documents and public information Plantiff submitted about Momnt Technologies and Criss River Bank.

23.    Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor and then rubber-stamped by the very company which Plaintiff had shown to be untrustworthy.

24.    After Plaintiff disputed the Momnt Technologies account with Experian and Trans Union, both of those CRAs forwarded Plaintiff's disputes to Momnt Technologies using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are electronically communicated back to CRAs.

25.     Even though the thrust and substance of Plaintiff's disputes were that Momnt Technologies and its affiliated lender, Cross River Bank, were under investigation and serially unreliable, the sum and substance of Experian and Trans Union's investigation did not include, at all, reviewing whether Momnt Technologies and Cross River Bank were reliable or not.  Rather, they simply asked Momnt Technologies whether the account was reporting correctly.

26.     This non-investigation was a fool's errand.

### *Background Regarding Momnt Technologies*

27.     Nonparty Momnt Technologies ("Momnt") is a company based in Georgia.

28.     Momnt is in the business of connecting lenders with merchants, many of whom purport to be healthcare clinics and home improvement contractors.

29.     Momnt designs, sells, and services loans, backed by third-party lenders, to consumers.

30.     Momnt Technologies services the loans for the lenders, which include Cross River Bank, and handles the credit reporting for them.

31.     A substantial amount, if not a majority, of these loans consist of financing products for (A) purported treatment plans offered by such ostensible healthcare clinics, for maladies such as erectile dysfunction, and (B) purported home improvements offered by such ostensible home improvement contractors.

32.     These transactions are or should be suspicious, to any discerning lender, on their face:

33.    Typically, courses of treatment offered by healthcare clinics are not paid for in a lumpsum, up-front manner.  Rather, patients and their insurers, per industry standards, are more commonly billed for each treatment or visit separately.

34.    Even more ubiquitously, the industry standard for home improvement contractors is not to be paid up front, but rather, to accept a down payment—usually consisting of less than half the contract price—and then to defer subsequent payments until only after partial or complete performance and after licenses and permits are secured and completed.

35.    These standards are reasonable and important, as they ensure that home improvement contractors actually perform the work that they were hired to do, and obtain the requisite licenses and permits, before being remunerated in full.

36.    The converse—paying home improvement contractors in full, up front—is problematic and invites unfinished work and fraud.

37.    Momnt Technologies openly and knowingly offered financing products to shady merchants who flaunted these industry standards.

38.    Momnt regularly uses Cross River Bank ("CRB") as its lender in such transactions.

39.    CRB was penalized by the Federal Deposit Insurance Corporation for, among other things, not properly vetting its loan products and the third parties it works with.

40.    CRB entered into a consent order in or about March 2023 with the FDIC to require additional oversight into its "credit underwriting practices" and "internal audit systems related to consumer protection laws and regulations."

41.    The consent order specifically mentioned the need for additional oversight and scrutiny of CRB credit products offered through "Third Part[ies]" like Momnt, including an entire

provision, with pages of due diligence requirements, related to "Third-Party Compliance Internal Controls."

42.    Meanwhile, Momnt and its affiliated, shady merchants, have been subject to plenty of scrutiny of their own.

43.    It is a matter of public record that the merchants that Momnt deals with engage in unlawful and fraudulent billing practices, and Momnt has actual knowledge of it.

44.    Specifically, Momnt itself sued Wasatch Mens Group ("Wasatch"), a group of merchants it had worked with, for unlawful and fraudulent billing practices.

45.    In *Momnt Technologies v. Wasatch Mens Group, Inc.*, 1:23-cv-02832 (N.D. GA 2023), Momnt was awarded a $24 million default judgment from Wasatch due to, *inter alia*, the fraudulent loans.

46.    Despite obtaining such a favorable and lucrative damages award, and reducing it to a judgment, Momnt Technologies then continued to attribute such types of fraudulent and/or unlawful loans to consumers and attempt to collect money from the consumers that Momnt itself had duped or otherwise looped into the transactions.

47.    For example, in the matter of *Cleveland v. Trans Union LLC et al.*, No. 2:25-cv-2093 (W.D. Tenn. 2025), the plaintiff, Michael Cleveland, alleged that Trans Union and Momnt were attributing to him a fraudulent loan from "River Ridge Medical Clinic," an entity that shares common ownership with Wasatch Mens Group, even after Momnt had obtained the default judgment against them.  *See id.*, Dkt. 1 (Complaint) at ¶35.

48.     In that matter, the plaintiff alleged that he had sent dispute letters to Trans Union informing them of these issues with Momnt Technologies but that Trans Union had failed to correct the matter. *Id.* at ¶¶34–53.

49.     Momnt and Trans Union were named as defendants in that suit and thereby put on notice of their credit reporting issues but failed to correct their practices thereafter.

50.     In December 2024, Kroll Bond Rating Agency ("KBRA")—a leading, global credit rating agency, established after the 2008 financial crisis, whose loan ratings are accepted by governmental entities like Freddie Mac—placed Momnt home improvement loans on downgrade.

51.     A key reason for this home improvement loan downgrade was that:

[Momnt] reported instances of fraud which it identified due to an increase in the number of customer complaints relating to certain merchants. Momnt identified nine merchants as associated with cases of identity theft and subsequently terminated these merchants. In September 2024, approximately $4.5 million of related loans were repurchased from MMNT 2023-1 due to breach of representations and warranties.

52.     The *modus operandi* of these fraudulent merchants that Momnt works with, as confirmed by 2024 investigations by Fox 8 Defenders in Louisiana (pertaining to shady healthcare clinics), appears to be that they accept a massive lumpsum payment financed via Momnt and then fail to provide the contracted services, with the merchant itself often going bankrupt, defunct, and missing soon thereafter.

53.     Even after such merchants close down, and even after the Louisiana Attorney General's office launched a multi-state investigation into Wasatch Mens Group, the men that Fox

8 Defenders spoke to said that Momnt told them they still needed to pay back their loans—even while, simultaneously, Momnt was in the process of suing Wasatch Mens Group in federal court.

### *Plaintiff Falls Victim to Momnt and One of Its Merchants*

54.    Around May 8, 2023, Plaintiff and his spouse, Richard Bell, met with a salesperson purportedly representing a company called Aesop's Gables.

55.    The company promised to renovate Plaintiff and his spouse's bathroom for $47,000.

56.    Upon reconsideration, during the legal and contractual three-day period of cancellation, Plaintiff concluded that the quoted price was excessive for the small scope of work.

57.    Accordingly, no contract existed between Plaintiff and the merchant and any subject $47,000 loan affiliated with Momnt was duly cancelled and should have been void and/or refunded.

58.    Plaintiff's and his spouse completed the notice of cancellation and furnished it in accordance with the contract agreement.

59.    Two weeks later, Plaintiff suffered a ruptured brain aneurysm, which left him in a coma for three months.

60.    When Plaintiff regained consciousness, he discovered that Momnt was reporting the $47,000 loan as outstanding.

61.    Plaintiff attempted to contact Aesop's Gables but found that the company was no longer in business.

62.    Plaintiff also contacted Momnt.  Not wanting his credit to be destroyed, Plaintiff made a single loan payment in August 2023, hoping Momnt would do the right thing and eventually reverse course, refunding everything.

63.     Momnt suspended payments until January 2025, apparently in acknowledgment of the merchant's misconduct.

64.     But as of January 2025, Momnt instructed Plaintiff to resume making payments beginning in February.

65.     But no renovation work had ever been performed at Plaintiff's home, and any financing product or loan associated with the renovation was as a matter of fact canceled and void.

### Plaintiff's Disputes to Defendants Trans Union and Experian

66.     On May 15, 2025, Plaintiff disputed the reporting of the Cross River Bank/Momnt Account with Trans Union.

67.     Plaintiff explained, because he had cancelled the door-to-door transaction, there was no resulting loan.  Plaintiff attached a copy of the notice of cancellation along with a copy of the Cross River Installment Loan Agreement.

68.     Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting.

69.     Trans Union did not heed the public information regarding Momnt that it had actual or constructive knowledge of.

70.     Rather, Trans Union merely sent Defendant Momnt an automated credit dispute verification ("ACDV").

71.     On June 17, 2025, Plaintiff received a dispute response from Trans Union, in which Trans Union verified the disputed information as accurate.

72.     Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

73.    Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's May 15, 2025, dispute.

74.    Thereafter, Defendant Trans Union failed to correct or delete the 30-day late notation appearing in Plaintiff's credit file.

75.    On July 14, 2025, Plaintiff sent a second dispute to Trans Union, along with Defendant Experian.

76.    Plaintiff again reiterated his previous dispute, emphasizing that the loan account remained active despite his timely notice of cancellation.

77.    Plaintiff attached a copy of the notice of cancellation along with other supporting documents.

78.    Plaintiff specifically put Trans Union and Experian on notice that:

I also reached out to Momnt, and Cross River Bank, but they are unhelpful. The furnishers, Momnt Technologies and Cross River Bank, know exactly what is going on here. They have a history of extending loans to companies that engage in fraud or go defunct right after the loans are issued. Please review the KBRA report linked here:    https://www.kbra.com/publications/RddRhqBx/kbra-places-three-momnt-technologies-trust-2023-1-ratings-on-watch-downgrade. Also please review check out this Fox8 investigation:    https://www.fox8live.com/2024/11/15/fox-8-defenders-loan-company-waives-more-money-owed-by-mens-clinic-patients/    (If the links don't work, I can provide you with hard copies.) Please correct this inaccurate information by deleting the loan and tradeline.

79. Plaintiff requested that Trans Union and Experian reinvestigate the disputed information, correct the reporting, and send him an updated report.

80. Upon information and belief, as detailed above, Trans Union and Experian merely sent Defendant Momnt an automated credit dispute verification ("ACDV") pursuant to Plaintiff's July 14, 2025, dispute to Trans Union, and parroted the response.

81. Trans Union and Experian followed no procedures to conduct an independent investigation into whether the furnisher at issue was untrustworthy based on the evidence submitted.

82. In particular, as of July 14, 2025, Trans Union was already on actual notice of false reporting and unlawful loans by Momnt Technologies, including Momnt's systemic issues and the *Wasatch Mens Group* lawsuit, by virtue of the *Cleveland v. Trans Union LLC et al.* lawsuit referenced above.

83. On August 7, 2025, Experian sent a dispute response, stating that the disputed information had been updated. But Experian continued to report the account as a charge-off with a $46,061 balance.

84. On September 2, 2025, Plaintiff obtained his updated Trans Union credit report, which still reflected the account as a charge-off with a $46,061 balance.

85. Trans Union and Experian had merely parroted the response of Momnt Technologies.

86. In or about December 2025, Plaintiff again disputed the matter with Experian and Trans Union.

87. Plaintiff put Experian and Trans Union on notice that:

Cross River Bank, who issued the loan, has been flagged by the FDIC for this. You can find the full report here and please contact me if the link does not work: https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d000007xEStAAM?operationContext=S1. The 34-page consent order between Cross River Bank and the FDIC, FDIC-22-0040b, included extensive provisions requiring Cross River Bank to do things like improve their fair lending practices, ensure they do not continue violating fair lending laws, and better scrutinize the loans they are underwriting, including via third parties like here. This is just the type of underwriting they should not be doing: a scam home improvement contractor that takes $47,000 and "goes out of business" before doing the job!

88.    But again, in response to Plaintiff's dispute, Experian and Trans Union performed no independent investigation.

89.    Upon information and belief, they did not even review the linked documents.

90.    Upon information and belief, Experian and Trans Union's policies and procedures prohibit their "investigators" from opening such links—they are not even allowed to do so if they wanted to.

91.    As a direct result of these unreasonable investigations, Experian and Trans Union "verified" the reporting of the account and continued to report the loan which fit the exact modus operandi of the fraudulent loans highlighted by the KBRA, the Federal Deposit Insurance Corporation, and federal lawsuits including *Cleveland v. Trans Union LLC* and *Momnt v. Wasatch Mens Group*.

92.     Experian and Trans Union's reports bore no information to tell lenders that the furnisher and lender at issue had a history of unsavory loan practices exactly of the type that occurred to Plaintiff.

93.     Such context, at the very least, would have showed lenders that Plaintiff was not a credit default risk.  Plaintiff's credit score should have been above 800, but for the Momnt reporting.

### *Plaintiff Suffered Actual Harm*

94.     Defendants continued to report the charged-off loan on Plaintiff's credit reports, even after being notified that this information is false or at least materially misleading.

95.     Plaintiff attempted to resolve these matters with Defendants, and his credit was destroyed and made completely unusable by Defendants' failures to correct the inaccurate reporting.

96.     As a result of the inaccurate credit reporting and illegal use of Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

a.   Harm to Plaintiff's credit opportunities;

b.   Harm to Plaintiff's ability, options, and rates to take out a home equity line of credit to *actually* renovate his home;

c.   Fear of being denied credit and apprehension in applying for new credit;

d.   Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes, and even out-of-pocket legal fees;

e.   Loss of time attempting to correct the inaccuracies;

f.   Stress associated with attempting to resolve this matter, including in the context of Plaintiff's coma; and

g.   Emotional distress.

### Defendants' Conduct was Willful

97.   The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

98.   Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

99.   As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

100.   Experian and Trans Union have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

101.   Momnt has been sued to defend several consumer credit lawsuits.

102.   Experian and Trans Union have even been a named co-defendant.

103.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

104.     Each Defendant regularly receives unredacted consumer dispute details from this database.

105.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian and Trans Union, many if not most being based largely on their failure to reasonably investigate consumer disputes.

106.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed Experian and Trans Union on notice that it may not merely "parrot" what its creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

107.     The CRAs, including Experian and Trans Union, have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'").  The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a case from fellow "Big Three" CRA Trans

Union. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).  The CRAs' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

108.    The CRAs have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

109.    In 2015, a large group of state Attorneys General forced a consent order from the CRAs by which they were required to develop procedures necessary to comply with the FCRA.[2] The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

110.    The AG Settlement also required the CRAs to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, Experian and Trans Union did not meaningfully comply with the AG Settlement in these regards.

111.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a

---

[2]    *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

112.   The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

113.   Among many of the CRAs' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.   Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact

---

[3] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

114.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe it would cost too much money to do so.

115.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (Against Defendants Experian and Trans Union)

116.    Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

117.    Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintained concerning Plaintiff.

118.    Defendants did so even after being put on actual notice that Momnt Technologies was not a reliable furnisher of loan data, having itself admitted to contracting with fraudulent merchants (going so far as to sue one group of such fraudulent merchants) and being shown by Plaintiff that Momnt Technologies continues to collect even on loans it admits were void, fraudulent, and/or unlawful.

119.    Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

120.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Against Defendants Experian and Trans Union)**

121.    Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

122.    Defendants violated 15 U.S.C. § 1681i by failing to conduct reasonable reinvestigation(s) of Plaintiff's dispute(s) after Plaintiff notified them that, contrary to what was reported in Plaintiff's file, he was not responsible for the $47,000 loan with Momnt, and by failing to maintain reasonable procedures to investigate Plaintiff's dispute(s).

123.    At minimum, Defendants' reporting was materally misleading insofar as it did not include context regarding Momnt Technologies downgraded credit rating which was due in part to the proliferation of fraud among its merchants as well as Cross River Bank's own similar issues.

124.    Defendants should not have been including data from those companies at all, but in particular, Defendants should have sided with consumers like Plaintiff upon reasoned and evidence-backed dispute.

125.    Defendants, however, followed no policies and procedures to conduct an independent investigation, instead merely "parroting" what Momnt itself said about the loan, even

though Plaintiff's dispute had presented evidence tending to discredit Momnt's reliability (including by Momnt's own admission via KBRA).

126.    Defendants' conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

127.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs and awarding Plaintiff such other and furth relief as the Court may deem appropriate and proper.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: February 11, 2026

> */s/ Noah Kane*
> Noah Kane
> CONSUMER ATTORNEYS
> 68-29 Main Street
> Flushing, NY 11367
> T: (518) 375-3963
> F: (718) 247-8020
> E: nkane@consumerattorneys.com
>
> *Attorneys for Plaintiff,*
> *James Brethour*